## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:                                              Case No. 3:14-bk-4766-PMG

John Riley O'Steen,
d/b/a Riley O'Steen Dairy,
Ashley Koon O'Steen,

_____ Debtors.                   Chapter 7

Lafayette State Bank,

                    Plaintiff,

vs.                                                 Adv. No. 3:15-ap-393-PMG

John Riley O'Steen,
d/b/a Riley O'Steen Dairy,
Ashley Koon O'Steen,

_____ Defendants.


## FINDINGS OF FACT, CONCLUSIONS OF LAW,
## AND MEMORANDUM OPINION

**THIS CASE** came before the Court for a two-day trial in this adversary proceeding.

Lafayette State Bank (the Bank) commenced the proceeding by filing a Complaint Objecting to

the Entry of the Debtors' Discharge and to Determine Dischargeability of Debt.  Generally, the Bank

alleges that the Debtors, John Riley O'Steen and Ashley Koon O'Steen, transferred or concealed cattle

and other property during their bankruptcy case, that the Debtors manipulated the claims in the case,

1

and that the Debtors did not provide adequate financial information during the case. Based on these allegations, the Bank seeks a judgment denying the Debtors' discharge pursuant to §727(a)(2), (a)(3), (a)(4), (a)(5), and (a)(6) of the Bankruptcy Code, and determining that the debt owed by the Debtors to the Bank is not dischargeable in the Chapter 7 case pursuant to §523(a)(6) of the Bankruptcy Code.

A fundamental goal of the Bankruptcy Code is to provide a debtor with a fresh start. Consequently, denial of a debtor's discharge is an extraordinary remedy, and exceptions to discharge should be construed in favor of the debtor and against the objecting party. The burden is on the objecting party to prove the objection by a preponderance of the evidence. In re White, 568 B.R. 894, 909-10 (Bankr. N.D. Ga. 2017).

In this case, the preponderance of the evidence did not establish the elements of the Bank's claims. Accordingly, the Debtors' discharge should not be denied pursuant to §727(a) of the Bankruptcy Code, and the debt owed by the Debtors to the Bank should not be excepted from their discharge pursuant to §523(a)(6) of the Bankruptcy Code.

**I. The bankruptcy case**

The Debtors were dairy farmers. Their home and dairy farm were located on approximately 213.34 acres of real property in Lafayette County, Florida.

On September 30, 2014, the Debtors filed a petition under Chapter 12 of the Bankruptcy Code. The Bank was a creditor of the Debtors, and the Bank's claim was secured by the Debtors' real property, equipment, and livestock.

On March 18, 2015, the Chapter 12 case was converted to a case under Chapter 11 of the Bankruptcy Code. (Main Case, Doc. 97).

2

On April 29, 2015, the Court entered an Order on Motion to Value Secured Claim of Lafayette State Bank. (Main Case, Doc. 112). In the Order, the Court determined that the value of the Debtors' equipment was $122,500.00, that the value of the Debtors' real property was $1,107,001.00, and that the value of the Debtors' livestock was $766,950.00, for a total value of the collateral securing the Bank's claim in the amount of $1,996,451.00.

On September 28, 2015, the Debtors' Chapter 11 case was converted to a case under Chapter 7 of the Bankruptcy Code. (Main Case, Doc. 170).

On December 23, 2015, the Bank commenced this adversary proceeding by filing a Complaint Objecting to the Debtors' Discharge and to Determine Dischargeability of Debt.

## II. Livestock and proceeds

In the proceeding, the Bank asserts that the Debtors were "self-liquidating" their cattle while the bankruptcy case was pending as a reorganization case, without informing the Bank of the cattle sales, and without accounting to the Bank for the sale proceeds. According to the Bank, for example, the Debtors listed 400 cattle on their original bankruptcy schedules, but had only 294 cows and $797.00 in their cull account on the date of the conversion to Chapter 7 approximately one year later.

Consequently, the Bank contends that the Debtors sold or misappropriated 106 cows during the bankruptcy case, without retaining or accounting for the sale proceeds, and that the Debtors thereby injured the bankruptcy estate and the Bank by diminishing their assets. (Doc. 1, Complaint, ¶¶ 19-44).

Based on these allegations, the Bank contends that the Debtors' discharge should be denied pursuant to §727(a)(2) and §727(a)(5) of the Bankruptcy Code, and that the debt owed to the Bank should be excepted from discharge pursuant to §523(a)(6) of the Bankruptcy Code. (Doc. 1, Complaint, Counts I, IV, VI).

3

Section 727(a)(2) and §727(a)(5) provide:

**11 U.S.C. §727. Discharge**

(a) The court shall grant the debtor a discharge, unless--

. . .

(2) the debtor, <u>with intent to hinder, delay, or defraud a creditor</u> . . . , <u>has transferred, removed, destroyed, mutilated, or concealed,</u> or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

. . .

(B) <u>property of the estate,</u> after the date of the filing of the petition.

. . .

(5) the debtor has <u>failed to explain satisfactorily,</u> before determination of denial of discharge under this paragraph, <u>any loss of assets</u> or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. §727(a)(2),(5)(Emphasis supplied).  Section 727(a)(2) is designed to preclude the discharge of a debtor who attempted to avoid paying creditors by concealing or disposing of assets.  Under §727(a)(2), a creditor must prove that the debtor possessed an actual intent to defraud creditors when he concealed or transferred the property. <u>In re White</u>, 568 B.R. at 910.  In other words, the debtor must have had actual fraudulent intent at the time of the transfer or concealment, such that the conduct was "blameworthy in an equitable sense." <u>In re Robertson</u>, 2017 WL 4367099, at 5 (Bankr. N.D. Ga.).

Section 727(a)(5) requires the objecting creditor to prove that the debtor owned identifiable assets at a time not too remote from the petition date, and that the debtor has failed to satisfactorily explain why the assets are not available to meet his liabilities. <u>In re Breedlove</u>, 545 B.R. 359, 379 (Bankr. M.D. Ga. 2016).  To provide a satisfactory explanation, a debtor is only required to describe what

4

happened to the assets, and is not required to show that the disposition was proper. In re White, 568 B.R. at 914.

Section 523(a)(6) of the Bankruptcy Code provides:

**11 U.S.C. §523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(6) for <u>willful and malicious injury</u> by the debtor to another entity or to the property of another entity.

11 U.S.C. §523(a)(6)(Emphasis supplied). A debt is not dischargeable under §523(a)(6) if the debtor committed an intentional act "the purpose of which is to cause injury or which is substantially certain to cause injury." In re Staggs, 573 B.R. 898, 908 (Bankr. N.D. Ala. 2017)(quoting In re Kane, 755 F.3d 1285, 1293 (11th Cir. 2014)).

The debtor's conversion of a creditor's collateral may fall under §523(a)(6) in certain circumstances, but only where the debtor acted willfully and maliciously in converting the property. In re Staggs, 573 B.R. at 914.

In this case, the preponderance of the evidence did not establish the Bank's claims under §727(a)(2), §727(a)(5), or §523(a)(6) for at least the following reasons:

### A. The sale of cattle was not prohibited in the bankruptcy case.

The Debtors testified, and the Bank acknowledged, that dairy farmers typically sell or cull low-producing cows from their herd as part of the normal dairy operation. (See Main Case, Doc. 143, Interim Cash Collateral Order)("The Court finds that the sale of Cattle and Cows by the Debtor is

5

necessary in the ordinary course of operating a dairy farm. The Debtors are authorized to sell cattle and cows as part of a 'cull' process utilized in the operation of the Dairy Farm.").

The Cash Collateral Orders entered in this bankruptcy case generally allowed the Debtors to sell personal property in the ordinary course of business, and the specific budgets attached to the Orders included monthly "cow sales" as cash receipts for the periods covered by the Debtors' revenue projections. (See Main Case, Interim Orders Granting Motion to Allow Use of Cash Collateral, Docs. 40, 73, 83, 115, 130, 143).

Further, the Debtors filed a Motion to Amend Cash Collateral Budget in their Chapter 12 case, and the Motion expressly contemplated the sale of dry cows by the Debtors. (Main Case, Doc. 77). The Court granted the Motion on February 26, 2015. (Main Case, Doc. 84).

### B. The sale proceeds were deposited into the Debtors' bank accounts.

From October 2, 2014, until June 18, 2015, the Debtors deposited the proceeds from the cattle sales into their bank account at Drummond Community Bank. The account is identified as Account Number 501801132 in the name of Riley O'Steen Dairy and Ashley O'Steen, and the deposits appear on the bank statements provided by Drummond Bank. (Debtors' Exhibit 11).

From June 23, 2015, until September 24, 2015, the Debtors deposited the sale proceeds into their bank account at First Federal Bank of Florida. The account is identified as a Debtor in Possession account in the name of John Riley O'Steen d/b/a Riley O'Steen Dairy, and the deposits appear on the bank statements provided by First Federal. (Debtors' Exhibit 11).

According to a summary prepared by the Debtors, the total amount of the cattle sale proceeds deposited into the two accounts during their reorganization effort was $244,941.34. (Debtors' Exhibit 11).

6

### C. The funds in the bank accounts were used for feed and dairy operations.

In a typical dairy operation, the Bank and the Debtors agree that "cull proceeds" are used to purchase cows to replace the cattle that were sold, in order to maintain the size of the herd. According to the Debtors, however, the Bank and the Debtors had developed a course of business prior to the filing of the bankruptcy petition, whereby the Debtors were permitted to use money from their cull account for operating expenditures other than the purchase of replacement cows for their dairy. The course of business was the result of a close and complex banking relationship that had existed between the Debtors and the Bank for many years prior to the filing of the bankruptcy petition.

Consistent with the prepetition course of business, the Debtors testified that the proceeds of the post-petition cattle sales were used to buy feed for the herd, to pay the dairy's bills, and to otherwise operate the dairy.

The Bank received copies of the Debtors' monthly account statements from Drummond Community Bank and First Federal Bank of Florida, and the statements are in evidence. (Bank's Exhibits 38, 39, 40, 41, 42, and 43).

The statements indicate that the funds in the accounts were used for expenses associated with the dairy. (See Debtors' Exhibit 6). The First Federal DIP account for August of 2015, for example, shows total debits in the amount of $75,779.42. Of the total debits, the four largest withdrawals were (1) check number 1036 in the amount of $9,750.00 to Lafayette State Bank, (2) check number 1069 in the amount of $10,384.17 to Howland Feed Mill, (3) check number 1092 in the amount of $4,053.78 to Suwannee Valley Electric, and (4) check number 1107 in the amount of $27,665.66 to Howland Feed Mill. (Bank's Exhibit 43). In other words, of total withdrawals in the amount of $75,779.42, the sum of $51,853.61 was used for cattle feed, utilities, and an adequate protection payment to the Bank.

7

The statements do not show that the funds deposited into the accounts were used for any inappropriate purpose, that the funds disappeared without explanation, or that the Debtors engaged in any kind of "spending spree" to dissipate the proceeds from the cattle sales before their case was converted to a case under Chapter 7.

### D. Conclusion

The sale of cattle was not prohibited in the bankruptcy case, the sale proceeds were deposited into the Debtors' bank accounts, and the funds in the bank accounts were used for cattle feed and other dairy expenses.

For these and other reasons, the Court finds that the preponderance of the evidence does not establish that the Debtors transferred the livestock and proceeds with actual fraudulent intent within the meaning of §727(a)(2), that the Debtors failed to satisfactorily explain the loss of the cattle or proceeds within the meaning of §727(a)(5), or that the Debtors willfully and maliciously converted the Bank's collateral within the meaning of §523(a)(6) of the Bankruptcy Code.

### III. Equipment

On their initial schedule of assets filed in the bankruptcy case, the Debtors listed the following three items of equipment as property in which they had an ownership interest as of the petition date:

Krone 742 Round Roll Bailer (the Bailer)

Krone 280 8' Hay Mower (the Mower)

Bifold 12 Wheel Hay Rake (the Rake)

(Main Case, Doc. 1). According to the Bank, the Debtors and the Bank agreed during the bankruptcy case that the value of all of the Debtors' equipment was $122,500.00, and that this total value included the value of the Bailer, Mower, and Rake. (Main Case, Doc. 112).

8

The Bank asserts, however, that the Bailer, Mower, and Rake were "missing" when it took possession of the Debtors' property after the case was converted to a Chapter 7 case, and that the equipment was concealed or transferred before the conversion. (Doc. 59, p. 22).

Consequently, the Bank seeks denial of the Debtors' discharge under §727(a)(2)(B) of the Bankruptcy Code, based on the fraudulent transfer of property after the filing of the bankruptcy petition. (Doc. 1, Complaint, Count I, ¶¶ 141-146).

Both Debtors testified that a representative of Lafayette State Bank had unilaterally included the Bailer, Mower, and Rake on the Bank's UCC-1 Financing Statement before the filing of their bankruptcy petition. According to the Debtors, the representative visited their farm, and wrote down all of the equipment that he observed, without determining whether the items belonged to the Debtors. Because the equipment was listed on the Bank's financing statement, the Debtors testified that they later included the Bailer, Mower, and Rake on their bankruptcy schedules to avoid the appearance that they were hiding the assets.

With respect to the Bailer, the Debtors and Curtis Koon (Koon) testified that Koon had leased the equipment for use by the Debtors and other family members. Koon is Ashley O'Steen's father. Koon further testified that he was in possession of the lease agreement for the Bailer, and that the lease is in his name. The Bailer was returned to Koon before the conversion of the Debtors' bankruptcy case.

With respect to the Mower and Rake, the Debtors testified that they had leased or purchased the equipment from a third party known as Wrotun Land, and that Wrotun Land had never been paid in full for the two items. Because of the unpaid contract price, the Debtors testified that the Mower and Rake were returned to Wrotun Land before the Debtors' bankruptcy case was converted to a Chapter 7 case.

The Debtors' explanations are consistent with their complex, long-term relationship with the Bank, and with their relationship with other family members. Accordingly, the preponderance of the evidence does not establish that the Debtors transferred or concealed the Bailer, the Mower, or the Rake with actual fraudulent intent within the meaning of §727(a)(2)(B) of the Bankruptcy Code.

**IV. The Georgia Property**

The Debtor, John Riley O'Steen, is the owner of certain real property located in Clay County, Georgia (the Georgia Property). The Georgia Property is described as a single family residential property on .4 of an acre, with a tax value for the 2015 tax year of $39,300.00. (Bank's Exhibit 20).

The Georgia Property was not listed on the Debtors' initial schedule of assets in their bankruptcy case. Consequently, the Bank contends that the Debtors' discharge should be denied pursuant to §727(a)(2), because they fraudulently concealed the Georgia Property from the bankruptcy estate. (Doc. 1, Complaint, Count I, ¶¶ 141-146).

On October 28, 2014, less than one month after filing the bankruptcy petition, the Debtors filed an Amended Schedule of Real Property. In the Amendment, the Debtors listed a "1/2 interest in hunting shack in Clay County, Georgia," and valued the Debtors' interest in the Property at $19,800.00. (Main Case, Doc. 35).

At trial, the Debtor testified that he and his brother-in-law each paid $12,000.00 for the Georgia Property when it was purchased in 2001, but that he was named the sole owner on the deed for convenience purposes only. According to the Debtors, the taxes and other expenses for the Property have been paid by the brother-in-law, and they have not visited the Georgia Property in years. Because they considered the Property to belong primarily to the brother-in-law based on his greater investment,

10

and because they did not use or travel to the Property, the Debtors testified that its omission from the original schedules was simply a mistake.

The Chapter 7 Trustee did not claim any interest in the Georgia Property in her administration of the estate. (Trustee's Report of No Distribution entered in main case on October 29, 2015.).

The Court has considered the circumstances surrounding the purchase and ownership of the Georgia Property, the Debtors' explanation for its initial omission from the schedules, and the prompt filing of an amendment to disclose an interest in the Property.

The preponderance of the evidence does not show that the Debtors concealed the Property from the bankruptcy estate with actual fraudulent intent, and their discharge should not be denied pursuant to §727(a)(2) of the Bankruptcy Code.

**V. Manipulation of claims**

This case was initially filed as a Chapter 12 case. The Bank asserts that a debtor does not qualify for relief under Chapter 12 of the Bankruptcy Code if the aggregate amount of his debt exceeds the sum of $4,031,575.00. (Main Case, Doc. 20).

According to the Debtors' initial schedule of liabilities, they owed the sum of $4,335,294.00 as of the petition date. (Main Case, Doc. 1). Consequently, the Debtors' first-day papers indicate that they did not qualify for Chapter 12 relief at the time that they filed the petition.

The Debtors testified that they knew of the eligibility requirement, but were uncertain of the actual amount of their debt when they prepared their schedules. The Debtors further testified that the uncertainty stemmed in part from the large number of loans extended by the Bank over a period of approximately twenty years (see Debtors' Exhibit 13), and that they intended to wait until all of the creditors' claims were filed in the case to evaluate their bankruptcy options.

11

The Bank, however, contends that the Debtors attempted to manipulate both the scheduled claims and the filed claims asserted in their case in an effort to satisfy the eligibility requirement for Chapter 12. The Bank therefore seeks to deny the Debtors' discharge pursuant to §727(a)(4) of the Bankruptcy Code based on their false oaths in connection with the claims. (Doc. 1, Complaint, Count III, ¶¶ 154-163).

Section 727(a)(4) provides in part:

**11 USC §727.  Discharge**

(a) The court shall grant the debtor a discharge, unless—

. . .

(4) the debtor <u>knowingly and fraudulently</u>, in or in connection with the case—

    (A) made a false oath or account;

    (B) <u>presented or used a false claim</u>.

11 U.S.C. §727(a)(4)(Emphasis supplied).  The purpose of §727(a)(4) is to prevent "knowing fraud or perjury."  Consequently, courts evaluate the challenged statements to determine whether they were part of a scheme to benefit the debtors at the expense of their creditors.  <u>In re Moore</u>, 508 B.R. 488, 494-95 (Bankr. M.D. Fla. 2014)(citing <u>In re Dupree</u>, 336 B.R. 490, 494 (Bankr. M.D. Fla. 2005)).

In this case, the essence of the Bank's cause of action under §727(a)(4) is that the Debtors improperly attempted to qualify for Chapter 12 of the Bankruptcy Code by scheduling or filing claims in a reduced amount, so that their aggregate debt did not exceed the eligibility limit. (Doc. 59, pp. 11-17).

**A. Restitution claim**

First, the Bank asserts that the Debtors did not include two restitution claims in their original schedule of liabilities. The restitution claimants do not appear as creditors holding unsecured claims on the Debtors' schedules.

One restitution claim, however, appears elsewhere in the Debtors' initial papers. Item 4 of the Statement of Financial Affairs requires debtors to disclose suits and administrative proceedings to which they were a party within one year of the petition date. In response to item 4, the Debtors disclosed a proceeding for civil theft in the "Dixie Circuit," which they identified as "Dixie Chevrolet v. Ashley O'Steen; 2009-CA-175," and listed the disposition of the action as "restitution order." (Main Case, Doc. 1).

The Debtors testified that they listed the restitution order on their Statement of Financial Affairs, and not in their schedule of liabilities, because they believed that restitution claims could not be "included" or "written down" as part of their Chapter 12 debt adjustment.

On July 2, 2015, the Debtors filed an Addendum to Schedule F and listed the following two restitution creditors: (1) Mayo Fertilizer & Farm Supply, for a disputed restitution claim in the amount of $35,998.98, and (2) Michael O'Steen, as Trustee of Dixie Chevrolet, for a restitution claim in the amount of $190,986.58. (Main Case, Doc. 123).

**B. Howland Feed Mill**

Second, the Bank asserts that the Debtors knowingly presented a Proof of Claim on behalf of Howland Feed Mill in an incorrect amount.

13

On the original schedules, the Debtors listed Howland Feed Mill as an unsecured creditor holding a claim in the amount of $355,325.00, and listed the consideration for the claim as "various open account." (Main Case, Doc. 1).

On October 10, 2014, the Bank filed its Motion to Dismiss or Convert the Debtors' Chapter 12 case, and alleged that their debts exceeded the eligibility requirements for that Chapter. (Main Case, Doc. 20).

On October 20, 2014, Claim Number 5 was filed on behalf of Howland Feed Mill in the reduced amount of $51,279.97. (Bank's Exhibit 14). Ashley O'Steen testified that she completed the claim form by writing in the amount of the claim, and by hand-writing "unpaid feed bill" as the basis for the claim. According to the Debtors, they believed that $51,279.97 was the actual amount that they owed Howland Feed Mill when the Claim was prepared, because any remaining amounts were based on an old account that had been written off by Howland.

Additionally, on October 28, 2014, the Debtors filed an Amended Schedule F and listed Howland Feed Mill as an unsecured creditor holding a claim in the amount of $51,279.97, to match Claim Number 5. (Main Case, Doc. 33).

It is significant that Claim Number 5 was signed by Blain Peerson as the General Manager of Howland Feed Mill, Inc. Blain Peerson acknowledged in deposition testimony that Howland Feed Mill maintained two accounts with the Debtors as of the petition date, and that the amount of $51,279.97 represented only one of the accounts. According to Peerson, he had the opportunity to correct the amount on Claim Number 5 when it was presented to him by Ashley O'Steen, and he signed the Claim that reflected only one of the accounts as an oversight on his behalf. (Bank's Exhibit 29, Deposition Transcript of Blain Peerson, pp. 10-13).

14

### C. Conclusion

In summary, the Bank asserts that the Debtors attempted to satisfy the debt limitation for Chapter 12 by omitting two restitution claims from their schedules, and by causing a Proof of Claim to be filed on behalf of Howland Feed Mill in a reduced amount.

The larger of the two restitution claims, however, was described in the Debtors' Statement of Financial Affairs filed with the petition. The Debtors explained that they did not list the restitution creditors in their schedules because they did not believe that restitution claims could be "included" or "written down" in bankruptcy. The claims were later included on an amendment to their schedules.

As to Howland Feed Mill's Claim Number 5, the Debtors both explained their belief (rightly or wrongly) that the balance of the debt was an old account that had been written off by Howland, and that the amount reflected on the Claim was correct. The Claim was signed by a representative of Howland who had reviewed the claim form before it was signed and filed.

Under these circumstances, the preponderance of the evidence does not show that the Debtors knowingly and fraudulently presented or used a false claim in their bankruptcy case, and their discharge should not be denied pursuant to §727(a)(4) of the Bankruptcy Code.

### VI. Operating reports

Finally, the Bank contends that the Debtors did not "provide complete, timely, and accurate operating reports following the conversion to Chapter 11." (Doc. 1, Complaint, ¶ 51).

Based on this and other similar allegations, the Bank asserts that the Debtors' discharge should be denied pursuant to §727(a)(3) and §727(a)(6) of the Bankruptcy Code. (Doc. 1, Complaint, Counts II, V).

Section 727(a)(3) and §727(a)(6) provide in part:

15

**11 USC §727. Discharge**

(a) The court shall grant the debtor a discharge, unless—

. . .

    (3) the debtor has <u>concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information</u>, including books, documents, records, and papers, <u>from which the debtor's financial condition or business transactions might be ascertained</u>, unless such act or failure was justified under all of the circumstances of the case;

. . .

    (6) the debtor has <u>refused</u>, in the case—

        (A) <u>to obey any lawful order of the court</u>, other than an order to respond to a material question or to testify.

11 U.S.C. §727(a)(3),(a)(6)(Emphasis supplied).  Under §727(a)(3), a discharge may be denied if the creditor shows that (1) the debtor failed to keep or preserve adequate records, and that (2) the failure makes it impossible to ascertain the debtor's financial condition or business transactions.  <u>In re Harmon</u>, 379 B.R. 182, 187 (Bankr. M.D. Fla. 2007).

Under §727(a)(6), a discharge may be denied if the creditor shows that the debtor "refused" to obey a court order.  A simple failure to obey the order is not sufficient.  Rather, for the debtor's discharge to be denied, the refusal must be a willful, intentional disobedience.  <u>In re Harmon</u>, 379 B.R. at 189.

In this case, the Bank's Complaint relates to the Debtors' maintenance of their post-petition books and records, and to the Debtors' compliance with their obligation to file financial information disclosing their post-petition operations.

The Debtors' Chapter 12 case was converted to a case under Chapter 11 on March 18, 2015. (Main Case, Doc. 97).

On May 28, 2015, the Debtors filed an Application to Employ Certified Public Accountant, and the Application was approved without objection. (Main Case, Docs. 117, 148).

In June of 2015, the Debtors filed their Chapter 11 Monthly Operating Reports for March, April, and May of 2015. (Main Case, Docs. 118, 119, 120). The Reports were prepared by the Certified Public Accountant hired by the Debtors and approved by the Court. The Debtors acknowledge that the initial reports were incorrect because of a misunderstanding with the accountant regarding the business entity that was subject to the reporting requirements.

In August of 2015, the Debtors filed Amended and Second Amended Monthly Operating Reports for March, April, and May of 2015. (Main Case, Docs. 132, 133, 134, 149, 150, 151). The Amended and Second Amended Reports were also prepared by the Debtors' Certified Public Accountant.

On September 4, 2015, the Court entered an Order on Ore Tenus Motion to Comply with Operating Report Requirements. (Main Case, Doc. 155). In the Order, the Court directed the Debtors to file all delinquent reports within ten days, and to attach bank statements, check registers, and copies of checks for all of the Debtors' bank accounts.

In September of 2015, the Debtors filed Monthly Operating Reports for June, July, and August of 2015. (Main Case, Docs. 156, 159, 161). The Reports were prepared by the Debtors' Certified Public Accountant. The Debtors' monthly bank statements for their personal and business accounts were attached to the Reports.

The Debtors' Chapter 11 case was converted to a case under Chapter 7 on September 28, 2015. (Main Case, Doc. 170).

The preponderance of the evidence does not show that the Debtors failed to keep records from which their financial condition may be known, or that the Debtors refused to obey a court order. They hired an independent professional to assist in the preparation of their Chapter 11 Monthly Operating Reports, and they provided bank statements reflecting the balances, deposits, and withdrawals from their bank accounts. The Debtors' discharge should not be denied pursuant to §727(a)(3) or §727(a)(6) of the Bankruptcy Code.

**VII. Conclusion**

Lafayette State Bank commenced this proceeding by filing a Complaint Objecting to the Entry of the Debtors' Discharge and to Determine Dischargeability of Debt. Generally, the Bank alleges that the Debtors transferred or concealed cattle and other property during their bankruptcy case, that the Debtors manipulated the claims in the case, and that the Debtors did not provide adequate financial information during the case. Based on these allegations, the Bank seeks a judgment denying the Debtors' discharge pursuant to §727(a)(2), (a)(3), (a)(4), (a)(5), and (a)(6) of the Bankruptcy Code, and determining that the debt owed by the Debtors to the Bank is not dischargeable in the Chapter 7 case pursuant to §523(a)(6) of the Bankruptcy Code.

A fundamental goal of the Bankruptcy Code is to provide a debtor with a fresh start. Consequently, denial of a debtor's discharge is an extraordinary remedy, and exceptions to discharge should be construed in favor of the debtor and against the objecting party. The burden is on the objecting party to prove the objection by a preponderance of the evidence. In re White, 568 B.R. at 909-10.

In this case, the preponderance of the evidence did not establish the elements of the Bank's claims. Accordingly, the Debtors' discharge should not be denied pursuant to §727(a) of the

18

Bankruptcy Code, and the debt owed by the Debtors to the Bank should not be excepted from their discharge pursuant to §523(a)(6) of the Bankruptcy Code.

Accordingly:

**IT IS ORDERED** that:

1. Final Judgment should be entered in favor of the Debtors, John Riley O'Steen and Ashley Koon O'Steen, and against the Plaintiff, Lafayette State Bank, on the Complaint Objecting to the Entry of the Debtors' Discharge and to Determine Dischargeability of Debt.

2. A Discharge of Debtors should be entered in the Chapter 7 case.

3. A separate Final Judgment will be entered consistent with these Findings of Fact, Conclusions of Law, and Memorandum Opinion.

**DATED** this 28th day of December, 2017.

**BY THE COURT**

PAUL M. GLENN
United States Bankruptcy Judge